**Meringolo & Associates, P.C.**
375 Greenwich Street
New York, New York 10013
(212) 941-2077 / (212) 202-4936 fax
www.meringololaw.com

September 5, 2012

Honorable Joan M. Azrack
Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  *United States of America against Ofer Biton* – Complaint No. 12-MJ-755 (SMG)

Dear Judge Azrack:

The defense respectfully submits this letter in support of defendant Ofer Biton's request for bail.  As demonstrated below, the Court should grant Mr. Biton bail pending trial because the defense is prepared to present a substantial proposed bail package and including a number of sureotors.  Moreover, Mr. Biton is neither a danger to the community nor a risk of flight, making detention improper under the Bail Reform Act, 18 U.S.C. 3142 *et seq.* and the controlling case law in this jurisdiction.  In the alternative, the Court should hold a hearing at which the government is required to prove that continued pretrial detention is warranted.

### STATEMENT OF FACTS

Mr. Biton, who is thirty-nine (39) years old and has no criminal record, was arrested on August 16, 2012, and charged through a criminal complaint with one count of Conspiring to Make False Statements in violation of 18 U.S.C §§ 371 and 3551 *et seq.*  Mr. Biton, an Israeli citizen, currently resides and owns three restaurants in New York City, employing approximately forty-five people.  Having built his live in America, Mr. Biton has a wife of twenty years and six children (ages spanning from two years old to eighteen years old), all currently residing in Manhattan as well.  The Defense respectfully submits that Mr. Biton is neither a danger to the community nor a risk of flight.

To assuage any concern the Court may have, Mr. Biton proposes an eight hundred thousand dollar ($800,000) bail package.  The proposed amount carries substantial weight considering not only its face value but also the fact that the alleged crime does not involve any ill-gotten gains.  For the reasons discussed below, including an analysis of the governing statutory and legal authority in this Circuit, the government cannot meet its formidable burden of proof as required under the Bail Reform Act to detain Mr. Biton before trial, and we respectfully request this Court grant Mr. Biton bail.

Mr. Biton's personal circumstances and family and community ties firmly establish that he neither poses a danger to the community nor a risk of flight.  Alternatively, assuming *arguendo* that he does pose a danger or a risk of flight, the proposed bail package sets forth conditions that reasonably assure Mr. Biton's appearance in court and the safety of the community.

It bares additional mention that currently Mr. Biton is charged through a criminal complaint – he has not been indicted – and the allegations do not include a crime of violence or financial harm to the public.

## ARGUMENT: MR. BITON SHOULD BE GRANTED BAIL PENDING TRIAL

### I. MR. BITON OFFERS A SUBSTANTIAL BAIL PACKAGE WITH SIGNIFICANT MORAL SUASION

To ensure compliance with any release conditions, including his appearance in this Court, as required, Mr. Biton proposes to post a $800,000 bond, secured by at least $400,000 in equity, to abide by a curfew set by Pretrial Services or by the Court, or to home detention (with permission to leave for religious, medical, and legal events), or to electronic monitoring with GPS, to turn over his passport and other travel documents, and further consents to government monitoring of his communication.

On behalf of Mr. Biton, there are now five (5) economically qualified individuals among his family, friends and the community willing to sign the $800,000 surety bond, as a testament to their belief that he is not a danger to the community or a risk of flight.   The willingness of five (5) family members and life-long friends, to forfeit their properties and life savings in the event that Mr. Biton was to violate any of his bail conditions constitutes a high degree of moral suasion. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991) ("We see no reason why an agreement to forfeit bail should not be valid and it adds considerably to the incentive value of the forfeiture condition).  Mr. Biton's co-signors, who are members of his family and of his community, are certain to face financial ruin in the event of a violation—a fact that Mr. Biton understands and a consequence he is extremely unlikely to risk.

### II. THE BAIL REFORM ACT FAVORS PRETRIAL RELEASE

Mr. Biton neither poses a danger to the community nor a risk of flight and the Court should, therefore, release him on bail so that he can participate actively in his defense. Pursuant to the Bail Reform Act, 18 U.S.C. § 3142 *et seq.*, the Court "shall order the pretrial release of [a defendant] on personal recognizance, or upon execution of an unsecured appearance bond . . . unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b).

If the Court determines that release on personal recognizance or unsecured bond poses a risk of nonappearance or of danger to the community, the Court "shall order the release of the person . . . subject to the least restrictive . . . condition, or combination of conditions, that . . . will reasonably assure the appearance of the person as required and the safety of any other person and

the community . . . ." 18 U.S.C. § 3142(c)(1)(B).

Only if the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" shall the Court detain the defendant pending trial. 18 U.S.C. § 3142(e)(1). A finding that no conditions will reasonably assure "the safety of any other person and the community" must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that the defendant poses a risk of flight must be supported by a preponderance of the evidence. *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). The burden of proof rests with the government.

In deciding "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the Bail Reform Act instructs the Court to consider "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because the Bail Reform Act favors pretrial release, "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citing *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)).

## A.  MR. BITON IS NOT A DANGER TO THE COMMUNITY

First and foremost, Mr. Biton is not charged with a violent crime or one of financial harm to the public.  Rather, the allegations contained in the complaint do not extend beyond those of false statements.  Mr. Biton has no criminal record, has been married for twenty years and together with his loving wife, has raised six children.  Further, he owns three pita restaurant businesses in New York City, is currently constructing a fourth, and is the primary operator of each.  Mr. Biton works everyday without incident, spending time in each of his restaurants. Given the substantial bail package proposed, the amount that Mr. Biton's friends and family stand to lose, the lack of violence or financial injury alleged, Mr. Biton's lack of criminal history, and the facts and circumstances particular to Mr. Biton's family and business affairs, it is without question that he is not a danger to the community.  Moreover, to the extent there could be any argument to the contrary, any combination of bail conditions proposed would certain obviate such danger.

Moreover, we respectfully submit that numerous defendants facing far more demonstrably dangerous and violent charges, such as murder, attempted murder, murder conspiracy, gun possession, extortion, kidnapping, to name a few, have regularly received bail in the Southern and Eastern Districts of New York.  Recently, the Second Circuit overturned Judge Richard M. Berman's previously entered detention order in *United States v. Trucchio*, 11-Cr-012 (RMB) (S.D.N.Y.) and granted Mr. Trucchio bail.  Mr. Trucchio, according to the government, is a captain in the Gambino Crime Family and is charged with racketeering, distribution of marijuana, cocaine, marijuana and ecstasy trafficking, assault in aid of racketeering, illegal gambling, and loansharking.  Mr. Trucchio was released on a three million dollar bond.

Additionally, in *United States v. Persico*, 376 Fed. Appx. 155 (2d Cir. 2010), the Second Circuit held that Michael Persico was wrongfully detained and granted his release on a $5,000,000 bond. The government alleged that Mr. Persico was an associate in the Colombo Crime Family, the son of the official boss, and brother of the acting boss, and indicted him on charges of extortion and murder conspiracy.  In the instant case, Mr. Biton is alleged to have made false statements, a crime not involving violence or financial injury to the public.

Most significantly, in *United States v. Sholom Rubashkin*, No. 08-Cr-1324 (LRR) (N.D. Iowa 2008), Mr. Rubashkin was charged with a 163-count Indictment, far exceeding the number of counts in the instant matter, alleging a massive bank fraud, money laundering, mail fraud, wire fraud, harboring undocumented aliens, false statements and violations of the Packers and Stockyards Act.  Despite the breadth and the magnitude of the charges, Mr. Rubashkin was granted bail on a ten million dollar bond.  Mr. Biton is charged for non-violent conduct on a far smaller scale, yet proposes a $2,000,000 bond.  Despite the violent nature of forced labor and harboring illegal aliens charges against the defendants in *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), the Second Circuit Court vacated the district court's order of pretrial detention, holding that, "it is only a limited group of offenders who should be denied bail pending trial." *Sabhnani*, 493 F.3d at 75.

The principles extended in *Sabhnani* by the Second Circuit are applicable here, and we contend that an order setting conditions of release, including, but not necessarily limited to, a personal recognizance bond, a curfew or, in the alternative, home detention, and monitored travel for religious services and/or medical appointments would significantly mitigate any danger.

In *United States v. Onofrio Modica*, et. al., 09-Cr.-1243 (LAK) (S.D.N.Y.), Mr. Modica, an alleged soldier in the Gambino Crime Family, was charged with, *inter alia*, racketeering conspiracy, racketeering, illegal gambling, extortion, and assault in aid of racketeering. Mr. Modica was alleged to have committed five of the eighteen racketeering acts alleged in the multi-defendant indictment including murder, jury tampering, and obstruction of justice, yet he was released on bail. Michael Scotto, one of Mr. Modica's co-defendants, was granted bail with a three million dollar bond. Mr. Scotto was charged with, *inter alia*, racketeering conspiracy, racketeering, extortion conspiracy, and sex trafficking of a minor.

Further examples of defendants who were alleged to be a danger of the community and released on bail include: *United States v. Gigante*, 85 F.3d 83, 84 (2d Cir. 1996) (alleged "boss" of "Genovese organized crime family"); *United States v. Spero*, 99-Cr.-520 (E.D.N.Y.) (Korman, J.) (alleged Consigliere of Bonanno Crime Family, charged with murder and other violence); *United States v. Bellomo*, 96-Cr.-430 (S.D.N.Y.) (Kaplan, J.) (alleged Genovese Acting Underboss Mickey Generoso, charged with murder conspiracy); *United States v. Fama*, 95-Cr.-840 (S.D.N.Y.) (reputed soldier charged with heroin distribution, kidnapping and murder); *United States v. Gregory Scarpa, Jr.*, 94-Cr.-1119 (E.D.N.Y.) (Raggi, J.) (accused participant in bloody Colombo Family war); *United States v. Orena*, 93-Cr.-1366 (E.D.N.Y.) (Korman, J.) (reputed soldier and boss' son, charged with murder conspiracy and weapons possession); *United States v. Failla*, 93-Cr.-294 (E.D.N.Y.) (Sifton, J.) (multiple high-ranking members of Gambino Family accused, among other charges, of killing a government witness); *United States v. Conti*, 93-Cr.-053 (E.D.N.Y.) (Glasser, J.) (organized crime defendant charged

with murder and murder conspiracy); *United States v. Russo*, 92-Cr.-529 (S.D.N.Y.) (Cedarbaum, J.) (alleged mafia captain charged with murder and other violent crimes); *United States v. Persico*, 92-Cr.-351 (E.D.N.Y.) (Sifton, J.) (alleged mafia captain charged with murder conspiracy in connection with internal Colombo war); *United States v. Rosenfeld*, 90-Cr.-755 (S.D.N.Y.) (Sweet, J.) (defendant released on bail despite charges of threatening one cooperator with a gun and killing another); cf., e.g., *United States v. Fiumara*, 02-Cr.-317 (D.N.J. 2002) (reputed head of Genovese Family's New Jersey faction, whose parole was revoked for four alleged murders).

Considering that the aforementioned defendants have all been granted bail while charged with crimes including murder, murder conspiracy, killing government witnesses, narcotics distribution, and kidnapping, Mr. Biton, who is charged, but not indicted, with non-violent crimes should be granted bail because he is not danger to the community.  Moreover, even if there were a presumption of dangerousness in this case, the factors set forth above and the proposed bail package would be sufficient to rebut it.

### B.  MR. BITON POSES NO RISK OF FLIGHT

Mr. Biton poses no risk of flight, and the government cannot establish that no conditions are sufficient to assure his presence in court by a preponderance of evidence.  Moreover, as evidenced by the letters of support annexed hereto and excerpted herein (*infra*), Mr. Biton has substantial familial and communal ties to New York. *See* 18 U.S.C. 3142(g)(3)(A).

Approximately thirteen years ago, Mr. Biton came to America with his wife and three children (at the time) in hopes of becoming American and providing as best he possibly could for his family.  Since, he and his wife have had three more children, and Mr. Biton has become a successful restaurant owner.  His three restaurants are located in Manhattan, and he employs approximately forty-five people all together.  Currently, Mr. Biton is building his fourth restaurant in the Upper West Side.  Mrs. Biton works part-time for Mr. Biton's business and takes care of their children.  Their oldest child is an eighteen year old daughter, who was admitted and scheduled to attend Yeshiva University, Stern College for Women this semester, postponed her attendance upon Mr. Biton's arrest in order to operate his restaurants.  However, without Mr. Biton's personal attention to the restaurants, their success is certainly limited.  The Biton family depends exclusively on the restaurants for their income.  As Mr. Biton's livelihood depends on his pita restaurant businesses which he solely operates, he would not have the resources to finance any hypothetical flight from the jurisdiction.  Moreover, the livelihoods of the forty-five employees depend on Mr. Biton to continue to operate his restaurants as well.  Accordingly, as Mr. Biton is in no position to risk substantial harm and potential ruin not only the lives of his wife and children, but those of his employees as well, he poses no risk of flight.  Simply being charged with a crime, conviction of which carries a potential sentence of incarceration, does not create a presumption of a risk of flight for the purposes of the Bail Reform Act. *United States v. Friedman*, 837 F.2d 48, 49-50 (2d Cir. 1988).

Additionally, Mr. Biton's fourteen-year-old daughter shares a unique bond with her father, and is currently being treated by a psychotherapist in order to cope with Mr. Biton's

5

absence from the home.[1]  Such exacerbates the point that Mr. Biton is extremely close with his family and accordingly poses no risk of flight.  He is simply unwilling to cause them further pain by fleeing.

The government may suggest that, given Mr. Biton's Jewish heritage and Israeli citizenship, he might be in a position to flee to Israel which is a country which is often difficult to extradite.  However Israel has amended its internal statutes to allow extradition to the United States. *United States v. Samet,* 2001 U.S. App. Lexis 21468 (2d Cir. 2001). Under Israel's Law of Return, "*[e]very Jew* has the right to come to this country as an oleh," i.e. to claim Israeli citizenship. *See* **Exhibit A**, The Law of Return 5710 (1950).[2]  Because of the long history of persecution of Jews throughout the world, the Law of Return was drafted to apply to all Jews. If this means that anyone to whom the Law of Return applies is an increased flight risk then "every Jew" would have to be viewed for bail purposes as a greater risk of flight than a non-Jew. That means at least 5,300,000 Americans would be viewed as heightened bail risks simply because they are Jewish.[3] This logic would extend, for example, even to a Jewish American whose family had lived in this country since the first Jews arrived on the shores of New Amsterdam in 1654.[4] It is ironic that a law designed to provide refuge to persecuted Jews has now become the basis for detaining a Jewish American who might otherwise have been released pending trial. Further, whatever validity may exist with respect to the government's Law of Return argument, there currently exists a streamlined, effective treaty that undercuts the argument entirely.

An extradition treaty between the United States and Israel has been in force since December 5, 1963. It was recently amended and improved in a number of significant ways in a protocol signed on July 6, 2005, and became effective on January 1, 2007. **Exhibit B**, C*onvention on Extradition Between the government of the United States of America and the government of the State of Israel*, U.S.–Isr., Dec. 10, 1962, 14 U.S. T. 1707, corr. version in 18 U.S. T. 382 (effective Dec. 6, 1963). Both the original treaty and the current amended version provide that each country must extradite its own nationals. Article IV of the original treaty provided that "[a] requested Party shall not decline to extradite a person sought because such person is a national of the requested Party." *See* Exhibit B. That is, Israel has undertaken to extradite its own nationals to the United States. Pursuant to the original treaty, there were numerous extraditions by Israel to the United States. Indeed, in 2005, the Justice Department advised the Senate that from 1999 to 2005, "the United States has extradited a total of 20 fugitives from Israel, of *whom 15 were Israeli nationals (including dual United States-Israeli nationals).*" **Exhibit C**, Statement of Mary Ellen Warlow, Director, Office of Int'l Affairs, Criminal Div., Dept. of Justice, Senate Committee on Foreign Relations, Nov. 15, 2005, at 7 ("Warlow Statement") (emphasis supplied).

---

[1] The defense received a letter from Ellen Levine, LCSW, confirming her treatment of Mr. Biton's daughter.  Due to the sensitivity of the matter, the defense respectfully withheld attaching such letter as an exhibit hereto, however is prepared to provide to Court and government a copy outside the public record.

[2] Also accessible at http://www.knesset.gov.il/laws/special/eng/return.htm.

[3] *See Haaretz.com, 12/09/07 at* http://www.haaretz.com/hasen/spages/903585.html (Israeli newspaper reporting on information collected by the Jewish Agency on the Jewish population of various countries). This is a conservative figure, because it includes only those who consider themselves Jews. Many individuals who do not consider themselves Jews would be so considered by the Law of Return. *Id.*

[4] *See, e.g.,* Arthur Hertzberg, The Jews in America at 19 (1989)

For example, in 2002, Michael Akva, an Israeli citizen, was extradited by Israel to the United States on securities fraud and insider trading charges.[5] In 2000, Sharon Haroush, an Israeli citizen, was extradited by Israel to the United States on fraud and theft charges.[6] In another notable case, Chaim Berger, an American citizen from New York, was indicted in 1977 in the Southern District of New York for defrauding the government of many millions of dollars.[7] He fled to Israel where he had never lived previously, and claimed citizenship under the Law of Return. He was extradited back to the United States, pled guilty and was sentenced to six years' imprisonment.[8] All of these extraditions took place under the pre-amendment treaty. In its 2005 statement to the Senate, the Justice Department reviewed the state of extraditions from Israel to the United States, and found the pre-amendment approach "to be workable." Warlow Statement at 7. Indeed, in 2006, the Attorney General of the United States publicly praised Israel for its pre-amendment extradition to the United States of an Israeli who was a suspected organized crime boss on drug charges.[9] Nonetheless, despite the history of successful extraditions, the Administration sought and obtained Senate ratification for a protocol amending the treaty in a way that would "significantly streamline [ ] the process of requesting extradition." Warlow Statement at 6. For example, the amended treaty now allows the use of hearsay;[10] "streamline[s] the procedures for 'provisional arrest;'"[11] expands the list of extraditable offenses, providing that any crime that constitutes an offense in both countries and is punishable by imprisonment of one year or more is extraditable;[12] and requires that only one offense need be extraditable--as long as there is one extraditable offense in the United States' extradition request, Israel can extradite on nonextraditable offenses as well.[13]

Most importantly, the amended version of the treaty reiterates that, "the requested Party shall not refuse extradition solely on the basis of nationality." Exhibit B, Article IV Section One. *See also* **Exhibit D**, Protocol between the government of the State of Israel and the government of the United States Amending the Convention on Extradition Signed at Washington, D.C., on Dec. 10, 1962, U.S.-Isr., July 6, 2005.[14] Thus, even if Mr. Biton were to claim Israeli citizenship and nationality, that would not bar his extradition.[15] Any

---

[5] *See U.S. Sec. and Exchange Comm'n, SEC Obtains Default Judgments Ordering Two Defendants to Pay $7.6 Million For Insider Trading,* http://www.sec.gov/litigation/litreleases /lr18193.htm.

[6] *See Israel to Extradite Citizen to U.S., United Press Int'l Network*, March 30, 2000.

[7] *See Randal Archibald, Israeli Court Allows Return of Man Indicted in Fraud*, N.Y. Times, Aug. 7, 2001, available at http://query.nytimes.com/gst/fullpage.html?res= 9C02E1DA1E3CF934A3575BC0A9679C8B63.

[8] *See United States v. Berger*, No. 97-Cr-00410-BSJ (S.D.N.Y. May 23, 2002) (Docket 167, Filed Judgment as to Defendant Chaim Berger).

[9] *See U.S. Attorney General praises Israel for fight against terror, international crime*, Associated Press, June 27, 2006, 6/27/06 APALERTCRIM 15:54:33.

[10] *See* Warlow Statement at 6; Article X bis, section 2 (providing that the information in the extradition request "shall be admissible as evidence in extradition proceedings even though they would be considered hearsay or otherwise would not conform to evidentiary rules applicable at trial").

[11] *See* Warlow Statement at 7; Article XI.

[12] *See* Article II.

[13] *See* Article II section 4.

[14] Also available at http://purl.access.gpo.gov/GPO/LPS65673.

[15] A limited exception applies to persons who were Israelis at the time of the offense. Such persons are still to be extradited from Israel to the United States, but only on the condition that they be returned to Israel to serve their sentences. *See* Warlow Statement at 6 -7; *see also* Israel's Extradition Law, 5714-1954, as amended, at section 1A. But that was part of the pre-existing procedure that the Justice Department found to be workable. Id. at 7.

American, whether Jewish or not, would be extraditable in the same way from Israel.

Not surprisingly, after the new Protocol was signed, extraditions from Israel increased. For example, in September 2010, the United States Attorney's Office for the Southern District of New York announced that Israel had arrested nine Israelis in a lottery telemarketing fraud scheme. According to the government's press release, "[t]his case involves the largest number of Israeli citizens ever to be provisionally arrested by Israel in anticipation of extradition."[16] Finally, defendants facing extradition after jumping bail to travel to Israel are typically detained by the Israelis pending extradition. For example, Michael Akva, an Israeli citizen extradited in 2002 for securities fraud and insider trading, *see supra* at 15 n.5, who had jumped bail in the United States, was detained by the Israelis until being extradited to the United States.[17]

In sum, there exists an extradition treaty that has always been "workable." After the recent amendments it is now better than "workable;" it is an up-to-date, streamlined treaty, regularly invoked for all serious criminal matters, including drug cases. It applies to everyone, Jews and non-Jews. It even applies to Israelis. This treaty insures that Mr. Biton would be returned to the United States, tried in the United States, and if convicted, that he would serve any sentence in the United States. Were he to flee to Israel, he would be detained pending extradition. Any American, whether Jewish or non-Jewish, would be treated the same way if he or she were to flee to Israel. Due to the effectiveness of the treaty, the Law of Return does not create an opportunity for successful flight from prosecution. And it therefore creates no motive to flee. Finally, to accelerate the extradition procedure, some courts have required as a condition of bail that defendants with strong ties to Israel (including citizenship) execute irrevocable waivers of extradition. *See United States v. Simon*, 2006 U.S. Dist. LEXIS 52979 (D. Nev. July 27, 2006) (Israeli citizen released upon condition of executing extradition waiver); *United States v. Karni*, 298 F. Supp. 2d 129, 133 (D.D.C. 2004) (same); *United States v. Cohen*, No. 00-CR-00100 (S.D. Fla. May 5, 2000); *United States v. Cohen*, No. 02-MJ-02592 (S.D. Fla. May 3, 2002); *United States v. Freund*, No. 99-CR-00561 (S.D.N.Y. May 10, 1999). Mr. Biton consents to execute such a waiver in this case if the Court deems it necessary.

The foregoing discussion notwithstanding, Mr. Biton enduring and strong connection to New York City ensures his appearance before this Court when required and full compliance with the conditions of his release. Under the Bail Reform Act, the absence of any genuine possibility of flight risk mandates that he be released on his personal recognizance pending trial. Assuming *arguendo* that Mr. Biton does indeed pose a flight risk, the Bail Reform Act still favors pretrial release. *Sabhnani*, 493 F.3d at 75. Even if the government establishes, by a preponderance of the evidence, that the defendant presents a flight risk, the government must also demonstrate, by a preponderance of the evidence, that no conditions could be imposed on the defendant that would reasonably assure his attendance in court. The operative standard is "reasonable assurances" not conditions that guarantee attendance. *United States v. Tomero*, 169 F.3d 639 (2d Cir. 2006).

[16] *See* Israel-Based Defendants Indicted and Arrested in Lottery Telemarketing Fraud Targeting U.S. Citizens, http://www.usdoj.gov/usao/nys/pressreleases/September08/mayoetalarrestindictmentpr.pdf
[17] *See SEC Obtains Default Judgments Ordering Two Defendants to Pay $7.6 Million for Insider Trading, supra*, n.12 (noting that Akva received "credit for time that he served while in custody in Israel awaiting extradition").

Multiple defendants in the Southern and Eastern Districts of New York facing fraud charges and with far greater connections to foreign countries than Mr. Biton have received bail and been deemed not to pose a risk of flight. Many of them had ties to Israel and had traveled there on previous occasions. For example, in *United States v. Joseph Shereshevsky*, 08-Cr.-01092 (S.D.N.Y.), on September 4, 2008, bail was granted by District Court Judge Lynch to a convicted felon charged in an alleged $250 million securities fraud action where the defendant had substantial international ties and business operations in Israel and Africa. Some of the countries in Africa had no extradition treaties with the United States. Mr. Shereshevsky's bail was a ten million dollar personal recognizance bond cosigned by ten financially responsible people, at least five of whom were not related to him through blood or marriage, one million dollars in property not owned by Mr. Shereshevsky, secured by $5,000 cash from each cosigner, and home confinement with electronic monitoring.

In *United States v. Ezagui*, M-08-530 in August of 2008, Magistrate Judge Go of the Eastern District of New York granted Mr. Ezagui bail even though he had been arrested at Kennedy Airport with a one-way ticket to South America, and was a citizen of Israel where his wife and children resided. His bail consisted of a three million dollar bond cosigned by his brother and one additionally financially responsible surety, secured by three properties owned by his brother and his brother's shares in a corporation, and home detention with electronic monitoring. While on bail, Mr. Ezagui's son was injured during service with the Israeli army, and the Court granted him permission to visit his son in Israel. He spent approximately two weeks there and returned without incident, adhering to the Court's restrictions.

In *United States v. Dina Wein Reis*, 08-MJ-02362, the defendant was charged with one count of conspiracy to commit wire fraud and six counts of wire fraud. She was granted bail by Judge Shira Scheindlin of the Southern District of New York with a ten million dollar bond secured by approximately 2.5 million dollars in property. Ms. Reis had a home in Israel, conducted business there, and even visited frequently.

In *United States v. Batista*, 163 F. Supp. 2d 222 (S.D.N.Y. 2001), bail was granted to a defendant with a criminal history and family situated in Puerto Rico. Likewise, in *United States v. Perananda*, 2001 U.S. Dist. Lexis 1320 (S.D.N.Y. 2001) bail was granted to a defendant who was an avowed drug addict with family ties outside the court's jurisdiction.

Based on the standard listed above, and the underlying policy of the Bail Reform Act, the government cannot meet its burden of proof of establishing by a preponderance of the evidence that there exist no conditions or combination of conditions which will ameliorate the risk of flight, and provide reasonable assurances of Mr. Biton's presence in court. Conditions including a personal recognizance bond, curfew or home detention with electronic monitoring, travel for religious and medical purposes under supervision, pledged property, and the five personal guarantees of co-sureties with moral suasion over him can provide ample assurances of Mr. Biton's appearance at trail.

### III. LETTERS OF SUPPORT ATTEST TO MR. BITON'S GOOD CHARACTER AND STRONG FAMILY AND COMMUNITY TIES

Mr. Biton's friends, and community members have written to the Court concerning his true character and propensities.  Accompanying this submission are letters of support that vividly illustrate his upstanding moral character and solid family and community ties.  18 U.S.C. 3142(g)(3)(A). See **Exhibit E-T**, respectively.  These letters depict a loving husband, devoted father, and deeply rooted member of his religious community.

Rabbi Ishar Azriel writes (See **Exhibit E**):

"I know Ofer Biton and his family from our childhood.  We grew up in the same town. He comes from a well respected and honorable family, a family that raised their children on solid values. Later, I knew Ofer as a husband and father. I saw how important his family and community are to him, and how important it is for him to impart his tradition and values to his children. He is a person that people know they can rely on, and he is a man who is loved by his friends and family."

Rabbi Yehuda Lipskier writes (See **Exhibit F**):

"I met Ofer about 3 years ago and from the moment we met he struck me as a kind and caring man.  He is a man dedicated to his family at the highest level a man who always extend himself to help a fellow human being whether he knows them or not, a man of strong religious beliefs and mural character.  He is a wonderful and generous man whose home is open to all. We can use more people like him."

Rabbi Raphael Benchimol writes (See **Exhibit G**):

"Ofer Biton, along with his wife, Vered, and six young children have been congregants of our community for the past few years.  During this time, they have participated in numbers community activites as well as adult and youth prayer services.  They have a broad network of close friends within the community.  The Bitons are widely-respected for their commitment to their religious observance as well as to their friends.  They have built a warm home on the Upper East Side of Manhattan which has been opened to many of our congregants.  It is my sincerest pleasure to attest to their moral character and commitment to our community."

Bennet Orfaly, Mr. Biton's friend, writes (See **Exhibit H**):

"He is a kind man with strong religious values that have been instilled in his children. His 13 year old son Yoel has spent time in my home with my children and his fathers influence is evident…He is a man that has shared his time with the less fortunate, and has taught his family to pray for people that have recently wronged him.  This can only come from a man with strength and character."

Joelle Reboh, a Biton family friend, writes (See **Exhibit I**):

"Mr. Ofer Biton is a loving father and husband and a very dear friend to me.  He has been a role model and positive influence on the community.  The Ofer I know is hard-working, kind-hearted and honorable…Given the devastating effect both emotionally and financially of him remaining incarcerated on his entire family, I beg this court to be compassionate and to allow bail so he can continue defending himself with the support of his friends and family…Ofer shows kindness in his everday actions, without expecting anything in return.  His acts of goodness are from his heart."

Asher Alcobi, Mr Biton's friend, writes (See **Exhibit J**):

"I have known Mr. Biton for the past 8 years and I have had the opportunity to be a guest at his home for Shabbat dinners and for holidays.  With six children of his own, Ofer is a model father and husband whose generosity extends beyond his own family.  Ofer has always opened his home to his friends, colleagues and to the less fortunate people of the community who are in need of a place to celebrate holidays…Throughout my acquaintance with Ofer, he was always respectful and trustworthy."

John Abroon, M.D. writes (See **Exhibit K**):

"Please be advised that Mr. Ofer Biton is a patient under my care.  I have known him since 2010.  He has a normal temperament and is of high moral character."

John Kozack, property manager, writes (See **Exhibit L**):

"As building manager of 200 east 64 st. where Mr. Ofer Biton resides, I am honest to report that Mr. Biton has been an outstanding tenant while residing here.  He is always curteous and  helpful to neighbors and our staff.  We love having him and his family living here."

Manuel Gomez, friend of Mr. Biton, writes (See **Exhibit M**):

"I have known Ofer for the past two years.  During that time Ofer has proven himself to be a reliable friend and devout family man.  Ofer is the sole financial provider for his family of six children.  He is a deeply religious man with significant ties to his community…I have complete confidence that Ofer is in no way a danger to himself or others and is not a flight risk."

Meital Bunker, Biton family friend, writes (See **Exhibit N**):

"I have know Mr. Ofer Biton for 10 years, him and his wife are very good friends to me…Mr Biton to me is a hardworking, loving, and caring person…Ofer is an honorable, honest, dedicated and most of all a great family man.  The care and affection he has for his wife and six wonderful children is something a lot of people envy.  I feel confident in saying that it is a great honor knowing someone like him."

Alexander Mitchell, Mr. Biton's friend, writes (See **Exhibit O**):

"We know Mr. Biton to be a man of principle, of religios faith and dedicated to his family…He has been a sterling example for his sic children and works hard to provide them with a private education. In addition to these responsibilities, Mr. Biton still gives his time and leadership to serve his community and to support various charitable causes…I know Mr. Biton to be a *mensch* and to go out of his way to help others bother within and outside his community…We ask you to consider Mr. Biton's commitment to his family and his positive impact on our city in the proceedings before you."

Adam Mukamal, Esq., close friend of Mr. Biton, writes (See **Exhibit P**):

"The two top priorities in Ofer's life are his faith in, and service to, God and the well-being of his family…I have observed Ofer help his friends in times of need, including by resolving personal and business conflicts and securing employment during unfortunate times. Ofer and his wife are valued and admired by many. Ofer is a trustworthy and God-fearing person who values his family…I can wholeheartedly attest to Ofer's moral character and his commitment to his family as well as his other personal responsibilities."

Samuel Wiesel, Mr. Biton's accountant, writes (See **Exhibit Q**):

"I would like to give a testimonial on his behalf that I have found him to be an upstanding person from my observation in dealing with him and his businesses. Furthermore, from my vantage point, I have seen that Mr. Biton conducts himself with integrity and honesty."

Tarik Ghadouani, Mr. Biton's long-time friend, writes (See **Exhibit R**):

"I have known Mr. Ofer Biton for 10 years now, since I started working in the kosher restaurant him and his wife frequently dine in. Our relationship developed from business to a friendship. The Bitons don't hesitate to invite me and my family to occasions including Shabbat dinners (even though we don't share the same faith). The Bitons became my family throughout the years since I don't have any family here. My "brother" Ofer is a hardworking, loving, and caring person who tries to succeed in everything he puts his mind to. Ofer is an honorable, honest, dedicated, helpful and most of all a great family man."

Zalman Vishedsky, Mr. Biton's friend, writes (See **Exhibit S**):

"My initial encounter with Ofer Biton was brief but it left an indelible impact on me in a profound way, Before the Passover holiday he had organized a massive humanitarian effort thru a campaign termed "kimcha d' Pischa" to provide basic food necessities to impoverished families throughout a myriad of Jewish neighborhoods…Since that time I have approached trucks Ofer for assistance with various efforts, both communally as well as individually, to help the unfortunate. He never said no. Not once. Instead he embraced each request with passion and vigor getting involved as though it was his personal challenge. In an age where most people put themselves first, Ofer has mastered the art of giving graciously…it is vital for Ofer Biton to be there for the masses of people impacts."

Avram Zaga, Mr. Biton's former landlord, writes (See **Exhibit T**):

"In 2004 I became the landlord of Mr. Ofer Biton he had been my tenant for approximately 3 years from 2004-2007.  Please be advised that during that time Mr. Biton was a model tenant.  He made all payments on time and fully complied with the lease agreement."

## CONCLUSION

Therefore, because he is neither a danger to the community nor a risk of flight, Mr. Biton respectfully requests that the Court grant bail and order his release on a personal recognizance bond or on any conditions deemed reasonable by the Court.

Thank you in advance for your consideration of this request.

Respectfully,


_____/s/_____

John Meringolo


Cc:   AUSA Anthony Capozzolo (via ECF)

13